**FILED**
**U.S. District Court**
**District of Kansas**
07/21/2026
**Clerk, U.S. District Court**
**By:** SND **Deputy Clerk**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**TYRON ELON WAGNER,**

      **Plaintiff,**

      v.                     **CASE NO.  25-3247-JWL**

**KANSAS DEPARTMENT OF
CORRECTIONS, et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff brings this pro se civil rights action under 42 U.S.C. § 1983.  Plaintiff is incarcerated at the Lansing Correctional Facility in Lansing, Kansas ("LCF").  The Court granted Plaintiff leave to proceed in forma pauperis.  On January 23, 2026, the Court entered a Memorandum and Order (Doc. 14) ("M&O"):  1)  dismissing Plaintiff's claims against the Kansas Department of Corrections ("KDOC"); 2) ordering Plaintiff to show good cause why his claims in Count II should not be dismissed for failure to state a claim; and 3) finding that the proper processing of Plaintiff's claims in Counts I and III could not be achieved without additional information from appropriate KDOC officials and ordering a *Martinez* Report on those claims.  On February 18, 2026, the Court entered a Memorandum and Order dismissing Plaintiff's claims in Count II.  (Doc. 18.)

The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A."  (Doc. 14, at 7.)  The *Martinez* Report (Docs. 23, 24, 26) (the "Report") has now been filed.  This matter is before the Court for screening Counts I and III.  The Court's screening standards are set forth in the M&O.

## I. Nature of the Matter before the Court

Plaintiff alleges in his Complaint that on March 9, 2025, several members of LCF's Special Operations and Response Team ("SORT") directed Plaintiff to engage in unlawful conduct by exploiting a regulation that requires inmates to obey any order, directive, or instruction given to the inmate by any employee of the facility. (Doc. 9, at 2, 7.)  Plaintiff alleges that as a result of his actions, he received a disciplinary sanction and is required to spend a year in segregation where he has suffered egregious injuries due to an unnecessary use of force.  *Id*. at 2.

As Count I, Plaintiff alleges cruel and unusual punishment.  *Id*. at 3.  Plaintiff was served with a disciplinary report for battery on another inmate.  *Id*.  Plaintiff alleges that several members of LCF's SORT forced Plaintiff to engage in unlawful conduct by exploiting the regulation.  *Id*. at 7.  Plaintiff alleges that as the regulation stands, an inmate can be lawfully required to commit unlawful acts.  *Id*. at 8.

Plaintiff alleges that on March 9, 2025, Officer Anna Bright approached Plaintiff and claimed that she needed assistance with an issue she was having with another inmate—Michael Parker.  *Id*. at 8.  She claimed that Parker had been harassing her in an escalating manner and instructed Plaintiff to address this behavior.  *Id*.  Because Plaintiff was uncertain of the validity of Bright's allegations and her subsequent solicitation of an intervention, Plaintiff spoke with Defendant Tyrell Godwin about the situation.  *Id*.  Plaintiff claims that Godwin verified that the allegations were true and gave Plaintiff and several of his associates a directive to "do something" about Parker's actions, as he had become "too disrespectful."  *Id*.  Plaintiff and his associates then spoke with Defendant Dalton Kinyon[1] about it and Kinyon directly ordered them to make certain

---

[1]  Although Plaintiff refers to the officer as Dalton Kinyun, the Report and the officer's affidavit show that his correct name is Dalton Kinyon.  *See* Doc. 23–23.  The Court will refer to the defendant as Dalton Kinyon and will direct the Clerk to correct his name on the docket.

that Parker "get[s] his ass beat," or Kinyon would begin making the lives of Parker's affiliates difficult.  *Id*. at 8–9.

Plaintiff alleges that K.A.R. 44-12-304 requires inmates to follow any order, directive, or instruction given to them by an employee of the facility.  *Id*. at 9.  Plaintiff alleges that on March 9, 2025, "it is alleged that Michael Parker was assaulted in his cell."  *Id*.   Later that evening, Plaintiff was placed in segregation for his suspected involvement in the battery on Parker.  *Id*.

Plaintiff alleges that he remains in segregation and that being ordered to bring physical harm to his friend has been a traumatic experience causing him to suffer from nightmares and fear.  *Id*.  Plaintiff alleges that he has attempted to commit suicide on several occasions.  *Id*.

 As Count III, Plaintiff alleges that he was subjected to excessive force on September 12, 2025.  *Id*. at 4.  Plaintiff alleges that a medical emergency was signaled for Plaintiff's cell due to his cellmate having suicidal thoughts and requesting to speak with a Behavioral Health Provider.  *Id*. at 11.  Plaintiff claims that as the officer in charge of the unit was attempting to de-escalate the crisis, Defendant Jerry Barton aggressively approached the cell and physically moved the officer away from the cell door.  *Id*.  Plaintiff claims that Barton's conduct was combative as he demanded that Plaintiff and his cellmate "cuff up" or be pepper-sprayed  *Id*. at 11–12.  Plaintiff claims that "[w]hile attempting to explain to Mr. Barton that his behavior was creating a hostile and volitive environment, a chemical agent was deployed into the cell, incapacitating both the Plaintiff and his cellmate."  *Id*. at 12.

Plaintiff claims that after his cellmate was immediately placed in handcuffs through the opened "trayport" in the door, Plaintiff extended his right arm through the trayport but no attempt was made to place his wrist in restraints.  *Id*.  Instead, Defendant Barton demanded that the cell door be opened, at which time Plaintiff raised his palms and stated "I'm not resisting."  *Id*.  Plaintiff

3

claims that Barton ignored Plaintiff's surrender and "responders" slammed Plaintiff to the ground where his arms and legs were pinned down. *Id*. Plaintiff alleges that Barton then began striking Plaintiff in the face and head with a closed fist while Plaintiff was securely restrained and defenseless. *Id*. Plaintiff claims that he sustained injuries, including lacerations above and below his left eye, busted capillaries in his left eye, and inflammation on his face and head. *Id*. Plaintiff alleges that the severity of his injuries required emergency medical treatment at Saint John Pavillion in Leavenworth, Kansas. *Id*. at 12–13. Plaintiff claims that he has an ongoing impairment to the vision in his left eye. *Id*. at 13.

The remaining defendants are: Jerry Barton, SORT at LCF; Anna Bright, LCF employee; Tyrell Godwin, SORT at LCF; and Dalton Kinyon, SORT at LCF. For relief, Plaintiff seeks $10,000,000 in compensatory damages; $10,000,000 in punitive damages; and injunctive relief in the form of an order requiring a change to K.A.R. 44-12-304 indicating that an inmate has no legal obligation to follow unlawful orders.[2] *Id*. at 5, 13.

## II. The Report

### A. Count I:

The Report provides that on March 9, 2025, SORT/SST Officers Daniel Boone, Anna Bright, Dalton Kinyon, and August Dillard were all working at LCF. (Doc. 23, at 8) (citing Exhs. 20, 21). After resident Parker made a "thumbs-up" gesture about six inches from Officer Anna Bright's face, Plaintiff and another resident (Eric Williams) spoke with Bright about the gesture and about how Parker had been behaving in this manner toward Bright at an increasing

---

[2]  The Court previously held that Plaintiff's claims for money damages against KDOC officials in their official capacities are subject to dismissal. *See* Doc. 14, at 13 (finding that the Eleventh Amendment bars claims for money damages against state officers in their official capacities). The Court also found that Plaintiff failed to allege a physical injury for his claims in Count I and he must show a physical injury for each claim in order to avoid the bar in 42 U.S.C. § 1997e(e).

rate. *Id*. Bright states in her affidavit that she did not order, request, direct, or command Plaintiff or Williams to attack or harm Parker. *Id*. (citing Affidavit of Anna Bright, Exh. 22[3], at ¶ 11). The Report states that Plaintiff corroborated this in his written appeal of his Disciplinary Report Number 5419, where he states that Bright did not give him an order. *Id*. (citing Doc. 1, Doc. 11, and Exh. 3).

Similarly, CO I Dillard recalled residents Danny Williams, Zachary Smith, and another resident (whose name he could not recall), also approached him and asked about the interaction between Ms. Bright and Mr. Parker. *Id*. at 8–9 (citing Affidavit of August Dillard, Exh. 25[4], at ¶¶ 11, 12). These residents were told of the 'thumbs-up' interaction he observed earlier that day. *Id*. at 9 (citing Exh. 25, at ¶¶ 11, 12). CO I Dillard also states that he did not give any order to "do something" about Mr. Parker or "beat his ass." *Id*. CO I Kinyon recalls Plaintiff and residents Williams and Smith approached him on March 9, 2025, asking for information regarding Mr. Parker and Ms. Bright and why a search of Mr. Parker's cell took place back in February 2025. *Id*. (citing Affidavit of Dalton Kinyon, Exh. 23, at ¶¶ 9–11). CO I Kinyon directly told them about Mr. Parker's behavioral issues and how other correction measures (like talking it out) were not working in stopping Mr. Parker's behavior. *Id*. CO I Kinyon states that he did not give any order or directive for the residents to attack, batter, injure, or "beat" Mr. Parker and did not believe his conversation with them gave them that kind of message. *Id*.

Although CO I Godwin was verified as working on March 9, 2025, from 0436 hours to 1427 hours, he does not have any recollection of interacting with, witnessing, or participating in conversations with Plaintiff, and does not recall giving Plaintiff any order, directive, or task to

---

[3] Although the Report refers to Exhibit 24 as Anna Bright's affidavit, her affidavit is located at Exhibit 22, Doc. 23–22.

[4] Although the Report refers to Dillard's affidavit as Exhibit 34, it is located at Exhibit 25. *See* Doc. 23–25.

batter resident Parker. *Id*. (citing Exh. 24, ¶¶ 6–7). The Report provides that "[n]either EAI investigation file LCF-SM-25-2 or LCF-BA-25-2 mention CO I Godwin and it appears that CO I Godwin may be mistaken for a different SORT Officer." *Id*.

Plaintiff was placed in restrictive housing pending an investigation for the battery of resident Parker. *Id*. at 9–10. Plaintiff and other residents (Eric Williams, Danny Williams, Chicago Elias, and David Benjamin) were found guilty of their disciplinary reports for the battery of resident Parker. *Id*. at 11 (citing Exhs. 4–7). None of the disciplinary reports for the other residents involved mention having been ordered by LCF officers to conduct the battery. *Id*.

The Report provides that:

> There is also evidence that officers are to sign a code of ethics that would prohibit them from such conduct under their authority as an officer. Internal Management Policy and Procedures 02-118D – Employee & Volunteer Rules of Conduct and Undue Familiarity requires officers be held to the standing of only obeying lawful orders given and they are expected to follow Kansas laws and regulations, which would include officers being expected to not coheres [sic] a resident into the complained of activity. IMPP 02-118D also specifically says that KDOC employees shall not encourage nor participate in behaviors like battery. (Exhibit 16-IMPP 02-118D(D)(3)(c).[5]

*Id*. at 10.

### B. Count III:

The Report includes video footage of the September 12, 2025 incident. The video footage is contained in Exhibit 10 to the Report, which is filed under seal and conventionally. (Doc. 29.) Based on the videos, the event goes from 8:35 pm to 8:40 pm. The Report summarizes the video as showing that at 8:35 pm, CS I Hillis[6] and another officer stopped in front of cell 119 and gesture

---

[5] Although the Report cites to Exhibit 16, IMPP 02-118D is contained in Exhibit 15. The cite also appears to relate to Section IV(B)(3)(c), not (D)(3)(c).

[6] The Report does not include an affidavit from Officer Hillis.

at the cell window which appears to have a covering blocking the view to the inside of the cell and appears to have been placed on the interior cell side of the window by the cell's inhabitants. (Doc. 23, at 4.)  Hillis appears to be talking to the residents inside of the cell and the officers continue to stay by the cell while Hillis appears to utilize her radio to trigger an alarm for assistance.  *Id*.  CO I Walter-Williams then walks into frame and appears to be communicating with Hillis and moving towards the cell door.  *Id*.  As Walter-Williams approaches the cell door food port and begins to open it, another officer comes into view appearing to be responding to the alarm.  *Id*. at 5.  The food port is successfully opened by Walter-Williams, and a single arm quickly comes out of the food port (the arm is identified by staff as Plaintiff's) opening towards the direction of Walter-Williams causing him to lean back from the opening.  *Id*.  Officers then take Plaintiff's arm and appear to struggle to get it back into the cell.  More officers arrive on scene, including Lt. Cobb, and stand to the side.  The Report notes that Lt. Cobb is standing under the stairs and can be identified by his mustache, and CO I Barton does not appear in the video recording at this point.  *Id*.

"CO I Walter-Williams appears to attempt to secure the food port but is unable to do so as the single arm appears to take the food port hostage."  *Id*.  Walter-Williams then can be seen spraying chemical agents into the food port. *Id*.  "Plaintiff's arm does not move from the food port but does motion with his middle finger in an obscene gesture directed at officers, appearing to be refusing to cooperate and continuing to keep the foot port from being secured."  *Id*.  Plaintiff then withdraws his arm from the food port and CS I Hillis appears able to close the food part and officers appear to be holding it closed. *Id*.  She can be seen pressing her ear to the door and appears to be trying to hear something from the occupants of the cell and then she motions to disperse some of the officers from the door and then re-opens the food port.  *Id*. at 6.  Hillis then appears to be

7

talking with the residents inside the cell. *Id*.

The video footage shows CO I Barton entering A6 building and approaching cell 119 at 8:38PM. *Id*. (noting that he is wearing a black SORT t-shirt, black pants, black shoes, glasses and has facial hair and tattoos on his arm). "At the same time as CO I Barton enters the cell[] the pink colored portion of the cell window covering is removed by on [sic] of the cell occupants leaving some of the cell window covered." *Id*. Barton and other correctional officers are standing at the cell side and appearing to be having a conversation with the residents inside of the cell. *Id*. "This continues, with CS I Hillis appearing to be the lead person communicating with the residents." *Id*. "Again, one of the cell's resident's hands appears (identified by LCF officers as Plaintiff) at the entrance of the food port of the cell." *Id*. "This hand is self-identified by Plaintiff in the Complaint and well as having been identified by the officers." *Id*. "CO I Barton then steps forward, appears to be looking at the hand and cell window and then pulls out purple gloves and starts to put those on his hand." *Id*. Hillis pulls out restraints and bends towards the opening of the food port. *Id*.

Hillis puts restraints on resident Wilber while Barton and others are putting on gloves. *Id*. at 7. Barton also gives Hillis a pair of gloves and she appears to be speaking with the residents of the cell as she is putting on the gloves. *Id*. CO I Pittman and Walter-Williams are standing behind Barton and Hillis. *Id*. Barton is then talking with one of the residents and looking directly into the now partially cleared cell window. *Id*. (noting that because resident Wilber is already restrained he would have been talking with Plaintiff who briefly can be seen pointing in the window with his hand in the food port). All six of the officers (Hillis, CO I Acevedo, Walter-Williams, CO I Pittman, and CO I Pennington) line up and then quickly go into the cell.[7] *Id*.

---

[7] Although the Report suggests that Officer Hillis was the first to enter Plaintiff's cell, the video reflects that Officer Barton entered the cell first. *See* Doc. 23, at 7 ("All six lined up officers (in approximate order of entry appears to have been done by: CS I Hillis, CO I Barton, CO I Acevedo[,] CO I Walter-Williams, CO I Pittman, and CO I Pennington.)").

8

Officers remove resident Wilber from the cell first and then resident Wagner. *Id*. Barton assists in removing resident Wilber first and then goes back into the cell for a few seconds and assists in bringing out Wagner. *Id*. The Report provides that "[o]verall, the video footage in total shows that CO I Barton did not manipulate the closure of the food port or close Plaintiff's hand in the food port contrary to Plaintiff's claims in the Complaint, similarly CO I Barton is not seen deploying any chemical agents into the cell." *Id*.

Officer Barton states in his affidavit that he did not use excessive force against Plaintiff, and that the injuries were not caused by him. *Id*. at 11 (citing Affidavit of Jerry Barton, Exh. 26, at ¶ 20). The Report provides that "Plaintiff did present to the facility clinic on September 12, 2025, for injuries to his wrist and face at 9:22PM . . . [and] Plaintiff was sent out to outside medical care at St. John Hospital for the lacerations above and below his left eye at 3:46AM on September 13, 2025." *Id*. (citing Exh. 2, at 169–76).

## III.  DISCUSSION

### 1.  Count I:  Cruel and Unusual Punishment

A prison official violates the Eighth Amendment when two requirements are met. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id*. To satisfy the objective component, a prisoner must allege facts showing he or she is "incarcerated under conditions posing a substantial risk of serious harm." *Id*.; *Martinez v. Garden*, 430 F.3d 1302, 1304 (10th Cir. 2005).

The Eighth Amendment requires prison and jail officials to provide humane conditions of confinement guided by "contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). The Supreme Court has acknowledged that the Constitution "'does not mandate comfortable prisons,' and only those deprivations denying 'the minimal civilized measure of life's

necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal citations omitted).  Indeed, prison conditions may be "restrictive and even harsh." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  "Under the Eighth Amendment, (prison) officials must provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir. 2001) (citation omitted).

The second requirement for an Eighth Amendment violation "follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Farmer*, 511 U.S. at 834.  Prison officials must have a "sufficiently culpable state of mind," and in prison-conditions cases that state of mind is "deliberate indifference" to inmate health or safety. *Id*.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.  "The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id*.  It is not enough to establish that the official should have known of the risk of harm. *Id*.

Plaintiff alleges in Count I that he was subjected to cruel and unusual punishment when he was forced by regulation to obey an order to harm a fellow inmate.  Plaintiff alleges that as the regulation stands, an inmate can be required to commit unlawful acts.  Plaintiff alleges that he was disciplined for battery after complying with the order.

Anna Bright states in her affidavit that she was working alongside CO I Dillard when Parker did the thumbs-up gesture about six inches from her face.  (Doc. 23–22, at ¶¶ 6, 7.)  Then,

10

resident Eric Williams was going through the lunch line and she asked Williams who Mr. Parker ran with "meaning which gang he is part of, if he was part of one." *Id.* at ¶ 8. She declares that:

> Mr. Williams was not familiar with him and asked me what was going on. I explained who Mr. Parker was and the negative actions he exhibited. I was told Mr. Parker runs with Mr. Williams' group and then he went and got Mr. Wagner to listen to me about the negative interactions I had been having with Mr. Parker. I did not give any orders or directives to harm Mr. Parker or have any of the people in Mr. Williams' group harm Mr. Parker.
>
> Mr. Williams and Mr. Wagner then left, and I continued with my duties. Shortly after and unprompted, Mr. Williams along with Mr. Wagner, approached me and said that Mr. Parker had denied any negative interactions with me. I simply explained to them that the behavior has been happening, and others have seen it happen today with the "thumbs-up" in my face. They then asked if they could talk with CO I Dillard.
>
> I was told the residents then went and asked CO I Dillard if the "thumbs-up" incident occurred. Chow then finished up and the residents went on their way, and I went to work at the B-block yard.
>
> I did not directly or indirectly tell, command, or otherwise order Mr. Wagner to attack or harm Mr. Parker. I had only asked if a conversation could be had with Mr. Parker from his peers. My only intentions from this question was to have the negative interactions stop, not for Mr. Parker to be injured.
>
> Shortly later, unsolicited, Mr. Williams and Mr. Wagner approached me again and told me not to come to them again.
>
> I was told later by other correctional staff that Mr. Parker was attacked by other residents (including Mr. Wagner) later that day.

*Id.* at ¶¶ 8–13 (internal paragraph numbers omitted).

The Report creates a factual dispute with Plaintiff's allegations in his Complaint. The *Martinez* report developed as a means "to ascertain whether there is a factual as well as a legal basis for [a] prisoner's claims." *Gee v. Estes*, 829 F.2d 1005, 1007 (10th Cir. 1987). "Courts may use a *Martinez* Report to clarify the complaint's factual allegations and assess their frivolity." *Martin v. v. Schnurr*, 2026 WL 1194984, at *4 (10th Cir. 2026). However, the Report may not be used "to resolve . . . a [bona fide factual] dispute[.]" *Id.* (citation omitted). Although the Report

11

states that officers did not direct Plaintiff to harm Parker, Plaintiff alleges in his Complaint that they did, thus creating a factual dispute. This factual dispute cannot be resolved at this stage and Count I passes screening. Although the Report suggests that one of the officers in Count I may have been misidentified by Plaintiff, this misidentification could be cured through amendment.

### 2. Count III: Excessive Force

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (citation omitted). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Id*. at 9–10.

Plaintiff must prove both an objective component and subjective component to succeed on an excessive force claim. *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003). To establish the objective component, Plaintiff must show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id*.

To establish the subjective component, Plaintiff must show that Defendants "act[ed] with a sufficiently culpable state of mind." *Cochran*, 339 F.3d at 1212 (citation omitted). "In order to establish such a claim, a prisoner must demonstrate that the defendant officials engaged in the 'unnecessary and wanton infliction of pain.' " *Reed v. Smith*, 1999 WL 345492, at *4 (10th Cir. 1999) (citation omitted).

Plaintiff alleges that he was subjected to excessive force by Defendant Barton on September 12, 2025, when Barton punched Plaintiff in the face and head while Plaintiff was

12

restrained.   In the Report, Officer Barton declares that there were six officers in the cell with Plaintiff and Plaintiff's cellmate, he did not slam Plaintiff to the ground or strike Plaintiff in the face or head, "and it is not reasonable to assume [he] would be able to strike Mr. Wagner considering there was such limited space in the cell due to all the people in the room." (Doc. 23–26, at ¶ 20.)   Officer Barton states that Plaintiff's face was injured prior to Barton's arrival on scene. *Id.*

Correctional Officer Dominick Walter-Williams provided an affidavit that declares that he was the first officer to arrive at the cell in response to the alarm called, and more officers arrived shortly after him. (Doc. 23–35, at ¶ 10.)   He states that:

> Upon my arrival, I was notified by the officer in charge (OIC) of the unit, CSI Hillis, that residents in A4-119 were making statements of "suicidal thoughts' and observed a covering of the resident's cell window from the inside of the cell.   Covering and/or impairing the visibility of a cell is a serious safety and security issue, especially if the resident is experiencing suicidal thoughts and a visual cannot be made to ensure they are safe.
>
> I opened the food port to the cell and upon opening it, resident Wagner attempted to grab my person by reaching a single arm through the opened food port.   I pulled out a canister of chemical agents due to the aggressive and uncooperative behavior resident Wagner had at that moment.   I believe the resident that attempted to grab my person was resident Wagner based on his appearance and tattoos and my knowledge of what resident Wagner commonly looks like.   I and other officers attempted to close the food port, but resident Wagner was blocking it with his arm so we eventually had to leave it open for a short period.
>
> Shortly thereafter, resident Wilber was compliant and was placed in restraints with no issue.   After being placed into his restraints, he backed away from the cell door and sat on the bottom bunk.
>
> Resident Wagner, however, continued to refuse direct orders to properly allow officers to restrain him and appeared determined to continue to self-harm and refuse orders to allow restraints to be placed on him.
>
> I and other SORT officers then made a reactive entry into the cell after due to self-harming was observed by the SORT officers.   Half of the group went further into the cell to escort Wilber out of the cell.   My half of the group had to restrain resident Wagner to prevent

13

any further injury to himself or staff to the best of our abilities and training. First resident Wagner was placed against the wall and then had to be placed onto the ground to gain compliance as he continued to refuse to cooperate with staff. His uncooperating was brief after he was placed onto the ground and we were able to fully restrain him so he could be removed from the cell and taken to the clinic.

I did not observe Officer Barton hit, strike, or inflict injury to resident Wagner while we were in the cell. It is my belief that the injuries resident Wagner sustained occurred prior to staff entry into the cell and was inflicted upon himself by banging his head/face against the wall and/or door of the cell. Prior to entry I could hear a resident hitting himself against his surroundings.

I am aware that Mr. Wagner was taken out of LCF via a state vehicle for sutures on his face.

*Id.* at ¶¶ 11–17 (internal paragraph numbers omitted).

The Report indicates that Plaintiff's injuries on September 12, 2025, were caused by self-harm, and not by Officer Barton. Plaintiff acknowledges in his Complaint that he has attempted to commit suicide on several occasion, claiming that being ordered to bring physical harm to his friend and the resulting placement in segregation has been a traumatic experience causing him to suffer from nightmares and fear. Although Plaintiff's medical records reflect a history of self-harm,[8] his medical record for September 12, 2025, reflects that he reported "that SORT came in and beat him up." (Doc. 26–2, at 171.) At a follow-up visit on September 23, 2025, he stated that "he was punched in the face." *Id*. at 186. The videos included in the Report show what happened outside of Plaintiff's cell, but they do not capture what happened after the officers entered Plaintiff's cell. The camera's view is blocked by the cell door.

The Report also creates a factual dispute as to Count III. Therefore, the Court finds that

---

[8] Plaintiff's medical records show that an alarm was called on July 17, 2025—two months before the incident—"due to resident hitting head on wall, self-harm." (Doc. 26–2, at 37.) Plaintiff had a nurse visit on August 4, 2025, due to him "stating to officers he was having thoughts of harming self." *Id*. at 84–85. The medical record states that Plaintiff began to cut his wrist and officers were able to get into his cell and stop him, and he was placed on crisis level 3. *Id*. at 85–86. On August 22, 2025, BHP was called by nursing due to Plaintiff "tying a rope around his bed and the other end around his neck" and jumping off the bed. *Id*. at 137.

14

Plaintiff's claim in Counts III also survives screening.

**IT IS THEREFORE ORDERED** that the Clerk is directed to correct the defendant's name to Dalton Kinyon.

**IT IS FURTHER ORDERED** that Plaintiff's claims in Counts I and III survive screening.

**IT IS FURTHER ORDERED** that Defendants shall have until **September 21, 2026**, to answer or otherwise respond to the Complaint.

**IT IS SO ORDERED**.

**Dated July 21, 2026, in Kansas City, Kansas.**

**S/ John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**

15